UNITED STATES of America,
Appellee,

v.

**John GIL, Defendant–Appellant.**

**Docket No. 01–1489.**

United States Court of Appeals,
Second Circuit.

Argued: April 17, 2002.

Decided: July 17, 2002.

Ioana Petrou, Assistant United States Attorney, Brooklyn, N.Y. (Alan Vinegrad, United States Attorney for the Eastern District of New York, David C. James, Catherine Youssef, Assistant United States Attorneys, on the brief), for Appellee.

Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York City (Erica T. Dubno; Thomas F. Liotti, Law Offices of Thomas F. Liotti, on the brief), for Appellant.

Before OAKES, JACOBS, and CALABRESI, Circuit Judges.

JACOBS, Circuit Judge.

John Gil appeals the judgment of the United States District Court for the Eastern District of New York (Dearie, J.), convicting him, after a jury trial, on a variety of mail fraud counts arising out of his submission of inflated invoices on a contract for heating, ventilation and air conditioning work at offices of the New York City Off–Track Betting Corporation ("OTB").[1]

It was uncontested that Gil procured from his subcontractors false and inflated invoices, submitted them to OTB for payment, and received payment. The defense was that the inflated subcontractor invoices were authorized by a side agreement—negotiated at a meeting attended by Gil and his lawyer, with OTB's general counsel, and two OTB Directors of Facilities—and that the overpayments were intended to compensate Gil for work he performed outside of the contract, including Gil's drawing of plans that (under the contract) should have been prepared in advance by OTB employees or consultants.

Gil appeals chiefly on the ground that the government violated its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to timely deliver to the defense an internal OTB memorandum. The internal OTB memorandum reflects an agreement by OTB officials to pay Gil in a manner that devi-

---

1. The New York City OTB is a public benefit corporation established for the purpose of operating a system of parimutuel off-track bet-ting within the City of New York, and all of its profits are paid to the City of New York.

ated from the written contract terms; confirms that Gil was doing extra-contractual work for OTB; and references a meeting in the office of OTB's general counsel that may or may not be the one at which Gil claims to have received authorization for the disputed billings.

We conclude that the internal OTB memorandum constituted *Brady* material that was suppressed by the government, and that Gil suffered prejudice as a result. We therefore vacate the judgment on all counts of conviction and remand for a new trial, should the government decide to reprosecute.

## BACKGROUND

### I

Gil was president and sole shareholder of John Gil Construction, Inc., a company specializing in heating, ventilation and air conditioning ("HVAC"). In 1996 and 1997, Gil successfully bid on contracts with OTB (collectively, "the Contract") to renovate and install HVAC in approximately twenty-five OTB offices. Because the scope of the work required at each OTB office was for some reason not definitely known at the outset, the Contract provided for payment on a "time and material" basis, *i.e.*, Gil was to be paid a percentage of profit above the actual cost of the labor and materials. Pursuant to Gil's bid package, he was entitled to a 32% mark-up on labor; pursuant to the Contract, Gil was entitled to a 12% mark-up on materials. The Contract provided that Gil would be given the specifications and design plans of the offices.

Gil was authorized by the Contract to hire subcontractors. Gil paid the subcontractors directly and then submitted the subcontractor invoices to OTB for reim-

bursement, along with a cover sheet attesting that the subcontractor invoices were accurate. The Contract did not provide for a mark-up on subcontractor bills, but OTB witnesses testified that Gil was nevertheless authorized to collect on them a 12% mark-up.

In 1998, a broad investigation was begun into irregularities in the operations of OTB as an agency. In the course of that investigation, it was found that Gil had been submitting inflated subcontractor invoices for reimbursement. On February 3, 2000, a grand jury handed down an indictment charging Gil with one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and twelve counts of substantive mail fraud in violation of 18 U.S.C. § 1341. By superseding indictment dated October 5, 2000, he was charged with the additional offenses of conspiring to engage in and engaging in monetary transactions in monies derived from mail fraud in violation of 18 U.S.C. §§ 1956(h) and 1957(a), (b).[2]

Trial began as scheduled on Monday, January 22, 2001. One or two business days before trial, the government turned over two boxes of documents containing "3500 material." *See* 18 U.S.C. § 3500.

Among these papers was the memorandum at issue in this appeal. It is written by OTB contract manager Linda Bradford to OTB general counsel Steven Sloan, and recounts a conversation between Bradford and Gil on January 28, 1997, relating to payment for so-called "expediting" services that Gil had subcontracted (hereinafter the "Bradford memo" or the "memo"). Such expediters are hired by contractors chiefly to obtain permits; their service is purely labor, and requires no materials. As the memo reflected, Gil was charging (or pass-

---

**2.** These offenses pertained to Gil's use of the monies he allegedly procured fraudulently;

the conspiracy charge was voluntarily dismissed by the government at trial.

ing through to) OTB a 12% mark-up on the expediters' services, which seemed wrong to Bradford because no mark-up on subcontracting was authorized by Contract, and in any event because expediters rendered services only (no materials) and the 12% mark-up ordinarily applied to materials only. According to the memo, Bradford challenged the mark-up as unauthorized, Gil told her it was authorized by Sloan, and Stephen Dorfman (a facilities director at OTB) confirmed the authorization.

Gil contends that the memo references the meeting, attended by Gil, his lawyer Taylor Walker, Sloan, and OTB facilities directors Dorfman and Neftali "Tony" Lozano, at which the inflated billings were authorized as a means of compensating Gil for the extra-contractual work of drawing the plans that (per contract) were to have been furnished in advance by OTB. (The prosecution's theory was that no such meeting occurred.) The prosecution argues that the memo reflects a meeting at which Gil was authorized to collect from OTB a 12% premium on (uninflated) bills paid by him to his subcontractors—an arrangement to which prosecution witnesses testified and as to which no criminal offense is charged—and that it does not reflect any authorization to inflate the subcontractors' bills to which that 12% premium was added.

Considered without the spin of either party, the memo reflects: [1] that a meeting took place in Sloan's office and was attended by at least some of the people who (according to Gil) attended the meeting at which the inflated billings were authorized; [2] that Gil was authorized to charge a 12% mark-up; [3] that Bradford (strangely) thought that the 12% was being passed through to the subcontractors themselves; and [4] that Gil (as he testified) was doing extra-contractual engineer-

ing services (although he lacked the requisite paper qualifications) and was being compensated for those services by some kind of bill inflation, an irregular arrangement that deviated from the bid parameters and that for some reason was condoned by the general counsel.

The defense claims that the Bradford memo was turned over on the Friday before trial; the government claims that it was turned over the Thursday before trial. In any event, the defense did not discover the Bradford memo until after the trial was over.

## II

Four subcontractors testified (as Gil conceded) that at his request they submitted to him two sets of invoices: one accurate set for which they received payment, and a second inflated set. An OTB contract administrator named Jason Podob testified that Gil was paid the amounts reflected in the inflated invoices plus the uncontested 12% mark-up applied to subcontractors.

Initially, OTB facilities director Dorfman categorically denied that he ever authorized Gil to submit inflated subcontractor invoices, and said he was unaware that anyone else had done so. Later, when asked whether he agreed to have Gil's costs included in the subcontractor bills, Dorfman hedged: "I don't recall agreeing to that."

OTB facilities director Lozano testified that the only work Gil was asked to do that Lozano considered extra-contractual was to hire an engineering firm to do drawings for one particular OTB office. Lozano instructed Gil to include this sum (approximately $5000) in his hours for his services at that location.

Gil's entire defense was that he was authorized to obtain payment for his extra-

contractual work by submitting inflated subcontractor invoices (on which he was then entitled to the 12% materials mark-up), and therefore he did not deceive or defraud OTB. He testified that: [1] a substantial amount of predicate work that (per the Contract) should have been prepared in advance by OTB employees or consultants (including drawings and plans) had not been done; and [2] when he raised the problem with Lozano, who was directly in charge of the renovations, Lozano told Gil, "Listen, I don't have any plans for when this place was built, but ... figure it out, get it done, and make it happen."

According to Gil, he reached an agreement with OTB officials to do the extra work, and accordingly prepared architectural or engineering drawings for many of the offices, did designs for sheet-metal fabrication and office layouts, took measurements and made the necessary load calculations and dunnage.[3]

It is undisputed that Gil submitted at least one invoice to OTB's accounting office for the extra-contractual work, labeled as such, but the invoice was rejected as unauthorized under the Contract. Gil claims that Dorfman and Lozano assured him that though he could not be paid for extra-contractual work under the Contract, "to make life easier we'll negotiate a flat amount or a lump sum for the extra costs," which should be included under subcontractors' costs because it was "easier for them to get processed and paid."

Apparently uncomfortable with this billing arrangement, Gil asked his lawyer to arrange a meeting with OTB's general counsel. Gil testified that at that meeting, attended by Gil, Walker, Sloan, Dorfman and Lozano, Gil was instructed to pad the subcontractor invoices to obtain payment for his extra-contractual work.

Walker testified that he attended a meeting at OTB with Gil, Sloan, Dorfman and Lozano, at which Gil was told to include his extra-contractual costs (or "soft costs") in the subcontractor invoices. New York State Assemblyman Adam Clayton Powell IV, a friend of Gil's, testified about a conversation he had with Gil and Lozano about how Gil would "include his cost on the subcontractor's cost."

The jury instruction on the defense of authorization was as follows:

> I join counsel in suggesting to you that there is, indeed, one fundamental question before you. Did, as the government alleges, the defendant John Gil intend to defraud OTB by submitting false or inflated invoices or was John Gil authorized to do so, as he himself testified.... [T]he defendant does not have to prove he was authorized to submit the inflated invoices. It is the government's burden to prove that he was not.

Joint App. at 150–51 (hereinafter "J.A.").

The jury deliberated for over a day before returning a verdict of guilty on all counts submitted to it.

## III

More than five months after trial, the defense discovered the Bradford memo among the 3500 material supplied just prior to trial. The defense had already filed a *motion for a judgment of acquittal or for a new trial*, which had been denied, but the defense moved to re-open that motion on *Brady* grounds.

The district court denied this motion, finding no *Brady* violation because the

---

**3.** According to Gil, OTB provided specifications and drawings for only two of the twenty-five locations.

Bradford memo [i] had been turned over to the defense prior to trial and was not "buried", [ii] was neither exculpatory nor favorable to the defense, and [iii] would not have altered the outcome of the trial.

### DISCUSSION

Gil challenges his convictions on the grounds that: [1] the district court abused its discretion in denying Gil's motion for a new trial because the government suppressed material evidence favorable to the defense, in violation of *Brady;* [2] the jury charge erroneously omitted Gil's defense of entrapment by estoppel, and mischaracterized the defense of authorization; [3] the evidence was insufficient to support the convictions; [4] the government made improper statements during summation; [5] a recent amendment expanding federal jurisdiction of the federal mail fraud statute over mails sent via private or commercial interstate carriers is unconstitutional; and [6] the court erred in enhancing Gil's offense level for obstruction of justice.

### I

We first consider Gil's constitutional challenge to the federal mail fraud statute, 18 U.S.C. § 1341.

The current statute provides, in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, *or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier,* or

takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (emphasis added). The highlighted passage was added by amendment in 1994. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, § 250006, 108 Stat. 1796, 2087 (1994). Gil contends that the 1994 amendment exceeded the scope of Congress's authority to legislate under the Commerce Clause, U.S. Const. Art. I, § 8, because it criminalizes conduct that takes place entirely intrastate and that has no substantial effect on interstate commerce. On that ground, he seeks reversal of his convictions on Counts Seven through Eleven of the superseding indictment, which charge mail fraud effected by intrastate mailings via Federal Express. This Circuit has not decided the question.

In *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court categorizes the activities that Congress may regulate under the Commerce Clause:

First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (internal citations omitted). A showing that a regulated activity substantially affects interstate commerce (as required for the third category) is not needed when Congress regulates activity in the first two categories. *See United States v. King,* 276 F.3d 109, 112–13 (2d Cir.2002).

■ We conclude that private and commercial interstate carriers, which carry mailings between and among states and countries, are instrumentalities of interstate commerce, notwithstanding the fact that they also deliver mailings intrastate. *See Lopez,* 514 U.S. at 558, 115 S.Ct. 1624; *Houston & Shreveport R. Co. v. United States,* 234 U.S. 342, 351, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) ("The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care."); *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (noting that Congress may regulate to "protect[ ] … the instrumentalities of commerce, as for example, the destruction of an aircraft (18 U.S.C. § 32)").

This view is consistent with the Fourth Circuit's opinion in *United States v. Photogrammetric Data Servs., Inc.,* 259 · F.3d 229, 249–52 (4th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002) (upholding constitutionality of mail fraud statute as applied to intrastate mailing placed with private or commercial interstate carriers), and with decisions elsewhere upholding convictions arising out of intrastate use of a privately owned instrumentality of interstate commerce. *United States v. Marek,* 238 F.3d 310, 320 (5th Cir.2001) (upholding conviction under the federal murder-for-hire statute, 18 U.S.C. § 1958 (2000), based on intrastate wire payment to a hit man via Western Union, "a quintessential facility *in* interstate commerce" that Congress may regulate under the second *Lopez* category); *United States v. Gilbert,* 181 F.3d 152, 158 (1st Cir.1999) (telephone used to make *in*-state bomb threat "is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction based on interstate commerce"); *United States v. Wadena,* 152 F.3d 831, 853 (8th Cir.1998) (depositing checks into FDIC-insured institution was sufficient nexus with interstate commerce to uphold money laundering conviction under 18 U.S.C. § 1957); *United States v. Baker,* 82 F.3d 273, 275–76 (8th Cir.1996) (upholding a conviction under the Travel Act, 18 U.S.C. § 1952(a) (2000), based on an extortion victim's use of an automatic teller machine ("ATM") that "triggered an entirely intrastate electronic transfer" between two local banks, because interstate network of ATMs is a facility in interstate commerce); *Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731, 738 (10th Cir.1974) ("[A]s long as the instrumentality itself is an integral part of an interstate system, Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control." (citations omitted)), *abrogated on other grounds, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

For the foregoing reasons, application of the mail fraud statute to intrastate mailings sent or delivered by private or commercial interstate carriers, is a permissible exercise of Congress's power under the second *Lopez* category.

## II

In a criminal prosecution, the government is constitutionally obliged to disclose evidence favorable to the accused when such evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government's duty under *Brady* is fairly settled:

To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th Amendment] to disclose that evidence to the defendant. Information coming within the scope of this principle ... includes not only evidence that is exculpatory, *i.e.,* going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*Leka v. Portuondo,* 257 F.3d 89, 98 (2d Cir.2001) (alterations in original) (quoting *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998)).

To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also In re United States (Coppa),* 267 F.3d 132, 139 (2d Cir.2001). Because Gil's *Brady* claim was raised in a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, we review the denial of the motion for abuse of discretion. *See United States v. Monteleone,* 257 F.3d 210, 218 (2d Cir.2001).

We first consider the (contextually related) issues of whether the Bradford memo was favorable to Gil and whether the defense was prejudiced by not using it; last we consider whether it was suppressed.

### A. Favorable To The Accused

Evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness. *Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936; *Coppa,* 267 F.3d at 139 (2d Cir.2001). Such evidence is generally called *Brady* material. *See Strickler,* 527 U.S. at 281, 119 S.Ct. 1936.

The district court found that the Bradford memo was not *Brady* material because "[i]t says not one word about authorizing Mr. Gil to file phony invoices with Off–Track Betting Corporation." J.A. at 274. The court later added: "It would not have occurred to me that this document is favorable to the defense." *Id.* at 278. We respectfully disagree.

The Bradford memo reads, in relevant part:

In my first conversation with John Gil today, he asked how he was to be paid for subcontracting expediting services for filing 25 Park Place. I learned that he was paying all his subcontractors a negotiated amount plus the mark-up rate applied to material.

When I told Mr. Gil that the *mark-up rate* is *not applied to labor,* he replied, *"That's the agreement we made with Steve Sloan."* He went on to say that he brought up the matter of how to pay subcontractors at great length at the pre-bid conference *and in a meeting in your office,* and you were the one who made the final decision.

* * *

This *negotiated-price-plus-material-mark-up subcontractor agreement* was later confirmed by Steve Dorfman. Since we made such an agreement, *why isn't it stated in the purchase orders? Why isn't it stated in the new time and material construction RFQ for which we just received bids?* If nothing is mentioned in the most recent RFQ about the subcontractor-negotiated-price method, when they bid, doesn't that give an unfair advantage to the construction firms we have under current contract?

* * *

In my second conversation with John Gil, I told him that all future expediting services will be handled by one of OTB's consultant engineers, and we'd get back to him on how he would get paid for the subcontracted services that have already been completed. Mr. Gil mentioned that he has $5,000 of completed expediting services for which he has yet to bill us. I'm also concerned about whether Mr. Gil has signed off on any of the HVAC drawings he has completed for us *since he told me he is the one who developed HVAC drawings.* I asked Mr. Gil whether he was a licensed engineer. He told me that he had a masters degree in engineering but he had only taken part 1 of the 3-part licensing exam. Subsequently, I spoke to Steve Dorfman. He told me he was unaware that John Gil was not a licensed engineer.

*Id.* at 224-25 (emphasis added).

At trial, witness after witness testified that Gil persuaded them to submit false invoices. The devastating impact of that testimony depended upon a background assumption, supported by the testimony of Dorfman and Lozano, that the invoices were being submitted to persons at OTB who (in the usual course) expected to receive accurate statements reflecting work done per the Contract. The Bradford memo had the potential to subvert this background assumption radically:

- The memo confirms the existence of a "negotiated-price-plus-material-mark-up subcontractor agreement," and as such, is arguably exculpatory. The defense could have argued that this agreement was precisely the one that Gil testified he negotiated with OTB officials: an agreement whereby Gil would be paid a flat fee for the extra-contractual work he performed, he would incorporate that amount in subcontractor invoices, and he would be paid that amount plus the 12% material mark-up. True, the memo goes on to say that any such arrangement should be reflected in the requests for bids, and it would be strange to reflect in an RFQ that the contractor would do work that by contract should be done by OTB, but the document and the record do not otherwise explain what the "negotiated price" would be.

- The memo authorizes extra-contractual payments to Gil, and thus supports the idea that certain OTB officials were not averse to doing business on that basis. Although Dorfman and Lozano conceded authorizing Gil to add an extra-contractual 12% mark-up to the subcontractors' bills, Bradford's concern·reflects that this arrangement was irregular, contrary to the bid process, and probably·illegal. The jury could thus be made to appreciate that OTB was not being run on a regular or businesslike basis.

- The memo reflects awareness by Dorfman that Gil was performing the extra-contractual work of designing the HVAC systems on various locations. (Indeed, Bradford was worried that Gil was doing engineering work for

which he had insufficient qualifications.) So the memo impeaches Lozano's testimony regarding the scope and amount of extra-contractual work Gil performed.

For all of these reasons, the Bradford memo is exculpatory and impeaching *Brady* material.

## B. Materiality and Prejudice

The suppression of exculpatory or impeaching evidence does not constitute a constitutional violation unless the evidence is "material."

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of trial.

*Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal citations and quotation marks omitted). We assess materiality or prejudice in light of the trial evidence. Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin. *United States v. Orena*, 145 F.3d 551, 559 (2d Cir.1998); *cf.*

*Leka*, 257 F.3d at 104 (discussing materiality of evidence with respect to a petition for habeas relief).

The district court found no prejudice because, "assuming the very best scenario for the defense, [the memo] would [not] have made a whit's bit of difference to the jury in their review of the evidence." J.A. at 275–76. We owe deference to this ruling of a well-experienced trial judge, but in the end we are not convinced.

We have already adduced the arguments and inferences that the memo could support or reinforce. They bear importantly on the central issue at trial: Gil's defense of authorization. Dorfman and Lozano testified that Gil was not authorized to submit inflated subcontractor invoices. Gil, along with Walker and Assemblyman Powell, testified to the contrary; and Gil and Walker's testimony referred to a meeting attended by various OTB officials at which this agreement was reached. That meeting was therefore critical to the defense. The prosecutor in her closing characterized it as "a very important meeting," but emphasized the prosecution's view that it never happened:

> This is the meeting where [Gil] brings his attorney to talk about how [Gil is] supposed to get paid, how he can put in extra hours, he can put in extra invoices. There's no documentation at all and Mr. Gil and his attorney can't get it straight between the two of them. I submit to you this meeting did not happen.

J.A. at 123. The prosecutor told the jury that Gil "couldn't point to one scrap of paper" to show that he was allowed to submit inflated subcontractor invoices. *Id.* at 130. And the prosecutor attacked broadside the idea that Gil was preparing the drawings and plans used in the renovations, at one point in summation displaying a crude hand-drawn plan Gil prepared, and

asking: "Is this worth over $100,000 in inflated invoices?" *Id.* at 113.

The Bradford memo references a meeting in Steven Sloan's office in which Sloan decided that the mark-up rate would be applied to labor, including subcontractor work, notwithstanding the Contract's failure to so provide. Whether Gil was "authorized" at such a meeting to pass through his extra-contractual compensation in subcontractor invoices (or not) is another question. But the Bradford memo documents: [1] an occasion at which such a conversation could be pinpointed; [2] Gil's preparation of the plans and drawings for the renovations (the premise cited by Gil to explain the deal), or at least Dorfman's awareness that Gil was doing that work; and [3] OTB's disregard for contractual, accounting and formal considerations that together would add considerable force to Gil's account.

The question hinged on credibility, and the jury was evidently struggling. During deliberations, the jurors requested "Mr. Lozano's first testimony in regards to any meeting between Walker, Gil, Lozano, Dorfman and Sloan in reference to 'soft costs.'" The jurors also asked the court for a read-back of certain other testimony of Dorfman and Lozano.

The Bradford memo was material for another reason as well. It confirms that Gil was doing or making the engineering plans, and therefore arguably demonstrates that [i] OTB employees were failing to do what they were paid to do, and [ii] such nonfeasance was tolerated by senior OTB officials. Every official aware of that waste of public funds had an incentive to conceal it by authorizing Gil to do engineering work and recover payment under the table, or by denying the existence of such an arrangement, or both.

One consideration that bears on *Brady* materiality is admissibility. The Bradford memo clearly contains hearsay, and the admissibility of the document, in whole or part, remains to be decided on remand by the district judge, whose evidentiary ruling on that question is entitled to the usual deference. For our current purposes, we need only satisfy ourselves that: [1] either all or part of the Bradford memo is admissible; [2] the memo could lead to admissible evidence; or [3] the memo would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise. *See United States v. Gleason,* 265 F.Supp. 880, 886 (S.D.N.Y.1967) ("[P]rosecution's duty of disclosure as affirmed in *Brady,* cannot be limited to materials or information demonstrated in advance to be 'competent evidence.'") (quotation omitted); *see also Spence v. Johnson,* 80 F.3d 989, 1005 n. 14 (5th Cir.1996) ("[I]nadmissible evidence may be material under *Brady.*"); *Coleman v. Calderon,* 150 F.3d 1105, 1116–17 (9th Cir.) ("To be material [under *Brady* ], evidence must be admissible or lead to admissible evidence."), *rev'd on other grounds,* 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998); *Wright v. Hopper,* 169 F.3d 695, 703 (11th Cir.1999) ("Inadmissible evidence may be material if the evidence would have led to admissible evidence."); *but see Hoke v. Netherland,* 92 F.3d 1350, 1356 n. 3 (4th Cir.1996) (ruling that inadmissible evidence, as a matter of law, is "immaterial" for *Brady* purposes).

For reasons already stated, we are satisfied that the Bradford memo can serve some of these purposes, and maybe all of them. Our ruling is therefore compatible with our prior determination in *Boyette v. Lefevre,* 246 F.3d 76 (2d Cir.2001) that a prosecuting attorney's interview report was not *Brady* material because it was not exculpatory *and* because it was clearly inadmissible. *Id.* at 91.

For these reasons, we conclude that the district court erred in ruling that the Bradford memo was not material. There is a reasonable probability that the disclosure of the memo would have resulted in a different outcome at trial, and the non-disclosure seriously undermines confidence in the verdict of guilty.

### C. Suppression

██ "*Brady* material must be disclosed in time for its effective use at trial." *Coppa*, 267 F.3d at 142. The district court found that the Bradford memo was timely disclosed because "[i]t was delivered," it was "in a box entitled 3500 material, labeled and indexed," J.A. at 276, 278, and it was "produced by the government well before trial." *Id.* at 335. Again, we disagree.

Beginning more than ten months before trial, the defense timely requested categories of documents that included the Bradford memo and that signaled reliance on the defense of authorization.

On March 13, 2000, Gil's prior counsel requested discovery, *inter alia*, of all *Brady* material, including "all documents, statements, agent's reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case." *Id.* at 227. The request specified:

> In addition, in each meeting that OTB officials held with contractors, tape recordings were made. It is understood by the undersigned that there was extensive discussion of subcontractor billing procedures at these tape recorded "pre-bid meetings." It is therefore requested that each of the tape recordings which were made of the pre-bid meetings be supplied to the undersigned.

*Id.* at 228. The defense followed up by letter dated April 11, 2000, requesting

all "Brady" and/or "Giglio" material including, but not limited to, all evidence indicating that the appropriate City Agency on whose behalf Defendant performed work, and acquired construction materials, were aware and/or countenanced the filing of periodic billing requests at a time, and under *circumstances where the Agency employers knew that the bills overstated the precise service, or function, for which payment was sought, but approved same because of additional work which the agency did not want to appear on a statement had been performed.*

*Id.* at 231 (emphasis added.) On May 10, 2000, the government supplied some documents to the defense but not the Bradford memo.

On July 7, 2000—six months before trial—the defense sought, "in addition to, and consistent with, any previous discovery requests, ... each, every and any internal memorandum and/or correspondence concerning the branch renovation projects contracted to John Gil Construction, Inc." *Id.* at 238–40. This request was repeated on November 7, 2000. By letter dated December 4, 2000, the government responded that "[a]ll discovery to which the defendant is entitled ... has already been provided."

On December 20, 2000, the defense asked the court to order the government to turn over all the information requested in defendant's November 7, 2000 letter. The defense had a "good faith belief the requested documents ... exist and [had] not been produced," even though they "constitute[d] exculpatory and impeachment evidence" and were "essential to the defense." *Id.* at 252. The defense warned: "As the trial date is rapidly approaching, the defendant is suffering incurable harm and prejudice because he is

unable to defend against the superseding indictment." *Id.* at 254.

According to the government, the Bradford memo: [1] was given to the defense as 3500 witness material, two business days before trial, "usefully indexed" under the name Stephen Dorfman, a chief government witness; and [2] listed in the exhibit list accompanying the 3500 material as "3500–SD–36, OTB Interoffice Memorandum, 1/28/1997 (2 pages)," so that diligent and systematic defense counsel would have found it and been able to use it at trial.

Gil argues that: [1] the Bradford memo was actually delivered to the defense on Friday, January 19th, not even one full business day before trial; [2] it was among more than 2,700 pages of material in two file boxes; [3] it was listed on page twelve of a 41–page index designating over 600 exhibits; [4] the individual items of 3500 material were not Bates stamped; and [5] the exhibits were not placed in separate file folders that corresponded with the "3500 numbers" listed on the exhibit list.

At oral argument, the government could offer no assurance that the 3500 material was supplied earlier than (as the defense claims) the Friday before the Monday trial. We therefore proceed on the assumption that the boxes were delivered on the Friday, though it is doubtful that the one day difference matters much. We have emphasized that disclosure of critical information on the eve of trial is unsafe for the prosecution:

> When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.

*Leka v. Portuondo,* 257 F.3d 89, 101 (2001).

Although the Bradford memo was produced before trial, the defense was not in a position to read it, identify its usefulness, and use it. It was among five reams of paper labeled "3500 material," delivered sometime on the Friday before a Monday trial, at a time presumably when a conscientious defense lawyer would be preoccupied working on an opening statement and witness cross-examinations, and all else.

Moreover, disclosure on the eve of trial "may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage." *Id.* at 101. The two-page memo was not easily identifiable as a document of significance, located as it was among reams of documents, and indexed as Dorfman 3500 material on page twelve of the exhibit list. Although the government discounts the significance of the memo, and reasonable minds can differ about that (the district judge, for one), the government runs a certain risk when it turns over so late documents sought by the defense for so long. *See Leka,* 257 F.3d at 102.

The prosecution contended on appeal that it received the Bradford memo from OTB "only days before" the government produced it to the defense. But in a Rule 28J letter submitted to this Court approximately three weeks after oral argument, the government concedes that an OTB investigator saw the Bradford memo at some point during the grand jury investigation of Gil. The government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the "prosecution team." *See Kyles v. Whitley,* 514 U.S. 419, 438–39, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The government thus constructively possessed the

Bradford memo long before it was turned over to the defense.

The government has not otherwise undertaken to justify its failure to find and timely deliver the Bradford memo, and there is no obvious explanation for this failure in light of the defendant's numerous requests for such documents.

## III

Gil also appeals on grounds of: [1] error in the jury charge; [2] insufficiency of the evidence; [3] improper statements during summation; and [4] sentencing error.

### A. Jury Instructions

■■■ Gil argues that the district court committed reversible error by refusing to charge the jury on the defense of entrapment by estoppel, and then by giving an "abbreviated" instruction on the defense of authorization. We disagree.

A criminal defendant is entitled to a jury charge that reflects his defense. A conviction will not be overturned for refusal to give a requested charge, however, unless that instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge. *United States v. Vasquez,* 82 F.3d 574, 577 (2d Cir.1996) (internal quotations and citations omitted).

■■■ There is no basis in the record to support an instruction on the defense of entrapment by estoppel. This defense arises where a government agent authorizes a defendant "to engage in otherwise criminal conduct ... and the defendant, relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief that he has in fact been authorized

to do so." *United States v. Abcasis,* 45 F.3d 39, 43 (2d Cir.1995); *see also United States v. Parker,* 267 F.3d 839, 844 (8th Cir.2001). Reliance is reasonable if "a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries." *United States v. Corso,* 20 F.3d 521, 528 (2d Cir. 1994) (internal quotation omitted).

■■■ This defense does not avail Gil. First, Gil's conduct was not "otherwise criminal"; it was criminal only if he had the requisite criminal intent to commit a fraud, intent that he lacked if he was authorized to submit inflated invoices. Second, Gil could not have reasonably believed that the OTB officials were government officials that had "authority to bind the federal government to an erroneous interpretation of federal law." *United States v. Ormsby,* 252 F.3d 844, 851 (6th Cir.2001).

■■■ The court's instruction on the defense of authorization focused on whether Gil was *actually* authorized to submit inflated invoices; Gil argues that the instruction should have focused on whether Gil *believed* he was authorized. Whether or not Gil was entitled to an instruction concerning his "reasonable belief," this defense theory was effectively presented elsewhere in the jury charge.[4] *See Vasquez,* 82 F.3d 574, 577 (2d Cir.1996). The jury was instructed that in order to convict Gil on the substantive mail fraud, it must find that Gil had the specific intent to defraud OTB; in order to convict on the conspiracy count, the jury was required to find that Gil acted willfully, with knowledge of the conspiracy's unlawful purpose, and in furtherance of its unlawful purpose. These instructions effectively precluded the jury from returning a guilty verdict if

---

4. Because Gil did not raise this objection below, we would review it on appeal for plain error. *See United States v. Weintraub,* 273 F.3d 139, 145 (2d Cir.2001).

it found that Gil believed he was authorized to do what he did.

### B. Remaining Claims

Gil argues that the evidence was insufficient to support his convictions.

A defendant seeking to overturn a conviction on the grounds that the evidence was insufficient bears a heavy burden. A conviction challenged on sufficiency grounds will be affirmed if, viewing all the evidence in the light most favorable to the prosecution, a reviewing court finds that *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.1997) (internal citations and quotation marks omitted). We have reviewed the trial evidence and conclude that the evidence sufficed.

Because of our disposition on Gil's *Brady* claim, we need not resolve Gil's claims arising from summation and sentencing.

### CONCLUSION

For the foregoing reasons, we conclude that the district court abused its discretion in denying the motion in which Gil sought a new trial on the basis that the government failed to comply with its *Brady* obligation. We therefore vacate the judgment on all counts of conviction and remand for a new trial should the government decide to prosecute. The mandate will issue forthwith.