# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 713 CAP |
| | : | |
| Appellant | : | Appeal from the Order of the Court of |
| | : | Common Pleas, Berks County, Criminal |
| | : | Division dated July 6, 2015 at No. CP- |
| v. | : | 06-CR-0000118-1997, directing that a |
| | : | new trial be held. |
| | : | |
| RODERICK ANDRE JOHNSON, | : | SUBMITTED:  December 2, 2016 |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE WECHT**                                                  **DECIDED:  December 19, 2017**

In 1997, Roderick Johnson was convicted on two counts of first-degree murder. He was sentenced to death.  Several years later, Johnson discovered that the Commonwealth had concealed certain documents that would have cast doubt upon the credibility of a key prosecution witness.  The court of common pleas held that the Commonwealth's failure to disclose this evidence violated Johnson's right to due process of law, in accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the prosecution must disclose evidence favorable to the accused that is material either to guilt or to punishment).  The court awarded Johnson a new trial.  We affirm.

On December 7, 1996, in the city of Reading, cousins Damon and Gregory Banks (collectively, "the Banks cousins") robbed Madelyn Perez at gunpoint in her boyfriend's apartment.  The Banks cousins stated that they were looking for drugs and

money.  They found neither.  Instead, they took a camcorder and a Sony PlayStation before fleeing.

Perez told her boyfriend, Shawnfatee Bridges, about the robbery.  She told him that the robbers were wearing green masks and green hoodies.  This fact was significant, because Bridges recalled seeing the Banks cousins wearing green hoodies earlier that day.  When Bridges met with co-defendants Johnson and Richard Morales that same evening, he was angry about the robbery.  At one point, Bridges grabbed a shotgun and stated that he wanted to go to the Banks cousins' house and kill them.  Bridges also showed Johnson and Morales a 9-mm Glock pistol that he was carrying.

The following day, Johnson, Bridges, and Morales went to a nearby K-Mart and purchased shotgun shells.  The trio then traveled in a minivan to the Banks cousins' home.  When they arrived, Bridges pretended that he was interested in recruiting the Banks cousins to oversee his drug-dealing business while he was out of town.  The Banks cousins, apparently believing this pretext, got into the minivan.

Later that evening, police officers found the dead bodies of the Banks cousins on a gravel driveway leading to a silt basin.  Around this time, police also received a report from a local restaurant (located fewer than five miles from the silt basin) that an unknown man had been shot.  Upon arrival, the police identified the wounded man as Johnson.  He was transported to a local hospital.

A few days later, while still hospitalized, Johnson gave a statement to the police.  He confessed to his participation in the Banks cousins' murders.  According to Johnson, his role in the conspiracy was limited to driving the minivan.  Johnson told police that, after picking up the Banks cousins, he drove Bridges, Morales, and the cousins to a dirt road near a construction site.  He recounted that Bridges and Morales got out of the van and told the Banks cousins to follow them, claiming that they would show the cousins

where Bridges' drugs were stashed. When the Banks cousins grew suspicious and refused to comply, Bridges walked around to the front of the minivan and started shooting. Johnson claimed that, as he was exiting the van, Bridges shot him in the torso. Johnson stated that, as he was attempting to flee, he saw Bridges shoot into the van at the Banks cousins. Johnson said he then walked to the restaurant, where the police found him.

The Commonwealth's scenario of the murders differed substantially from Johnson's. At Johnson's capital murder trial, a forensic pathologist testified that one of the bullets recovered from the body of Damon Banks was a .38 caliber projectile. The Commonwealth presented evidence that a .38 caliber handgun was recovered close to the murder scene, and the Commonwealth's ballistics expert matched that firearm with the bullet recovered during Damon Banks' autopsy. In order to rebut Johnson's claim that he was merely present at the scene of the murders, the Commonwealth sought to prove that Johnson fired the .38 caliber bullet recovered from Damon Banks' body.

To refute Johnson's version of events, the Commonwealth called George Robles as a trial witness. Robles testified that Johnson owned a .38 caliber handgun like the one found near the crime scene. He also testified that he visited Johnson in the hospital just after the murder, and that Johnson confessed to taking the .38 caliber murder weapon from the murder scene, wiping it off with his shirt, and then throwing it on the side of the road about a quarter mile from the construction site. At trial, Robles provided the crucial link between Johnson and the murder weapon, and supplied the testimony that countered Johnson's defense.

Given the importance of Robles' testimony, defense counsel attempted to undercut his credibility on cross-examination by showing that he was involved in ongoing criminal activities and was an informant for the Reading Police Department.

The assistant district attorney objected to this line of questioning, characterizing as "absurd" defense counsel's belief that Robles was a drug dealer or an informant, and emphasizing that Robles had never been convicted of, or even arrested for, any crime. R.R. at 589a. Defense counsel responded that his questioning "does go to [Robles'] credibility." *Id.* at 590a. The trial court sustained the prosecutor's objection in part, but did not prevent the defense from "inquiring as to any legitimate area of [Robles'] possible bias or interest in the outcome" of the trial. *Id.* at 591a.

The problem was that defense counsel was flying blind; he had the court's permission to inquire into Robles' bias, self-interest, or motivation to lie, but he knew of nothing concrete to ask Robles. Defense counsel did the best that he could. He asked Robles if the Reading Police had ever paid him for information (Robles denied this). He asked whether Robles' nickname was "Gambino" (Robles admitted this). And he asked if Robles was the leader of a gang (Robles denied this). To the extent that Robles' answers did any harm to his credibility, the damage likely was repaired on redirect, when Robles reminded the jury that he had never been arrested for, charged with, or convicted of, any crime. *Id.* at 593a.

Ultimately, Johnson was convicted on two counts of first-degree murder. Following a penalty phase trial, the jury sentenced Johnson to death. After his trial, Johnson obtained a letter that Robles had sent to Reading Police Detective Angel Cabrera while Robles was jailed as a material witness[1] (after he failed to appear in court to testify against Johnson). In the letter, Robles stated that he would "do anything" to get out of jail. On direct appeal, Johnson argued that Robles' letter constituted material impeachment evidence that the Commonwealth was required to disclose pursuant to

---

[1] *See* Pa.R.Crim.P. 522 (permitting courts to set bail for any material witness in a criminal proceeding when there exists adequate cause for the court to conclude that the witness will fail to appear when required).

*Brady*. This Court rejected Johnson's argument, finding that "the Commonwealth discharged its *Brady* disclosure responsibilities by providing [Johnson's] counsel with [a] police report that referenced the Robles letter." C*ommonwealth v. Johnson*, 727 A.2d 1089, 1095 (Pa. 1999).[2] This Court affirmed Johnson's death sentence. *Id.* The United States Supreme Court denied *certiorari*. *Johnson v. Pennsylvania*, 528 U.S. 1163 (2000).

In April 2000, Johnson filed a petition for post-conviction relief, followed by a second petition in September 2003.[3] The PCRA court denied the former and dismissed the latter. This Court affirmed both of those decisions. *See Commonwealth v. Johnson*, 815 A.2d 563 (Pa. 2002); *Commonwealth v. Johnson*, 863 A.2d 423 (Pa. 2004).

In 2005, Johnson filed the PCRA petition that led to this appeal. While his petition was pending in the PCRA court, Johnson also was pursuing federal *habeas corpus* relief in connection with an unrelated homicide case. In that unrelated case, much like in the first-degree murder conviction underlying today's appeal, Johnson was found guilty of the killing after the Commonwealth called Robles to testify that Johnson had confessed to committing the killing. During Johnson's federal *habeas* proceedings, the United States District Court for the Eastern District of Pennsylvania ordered the Commonwealth to disclose to Johnson any evidence of a relationship between Robles and the Reading Police Department and/or the Berks County District Attorney's Office, "including any documents relevant to Robles being a paid or unpaid informant or a cooperating witness." *See Johnson v. Folino*, 671 F. Supp. 2d 658, 664, n.4 (E.D. Pa. 2009), *rev'd on other grounds*, 705 F.3d 117 (3d Cir. 2013).

---

[2]    Although unnecessary to our holding, we also opined that Robles' letter was not material for *Brady* purposes.

[3]    *See* 42 Pa.C.S. § 9541, *et seq* (Post Conviction Relief Act) (hereinafter, "PCRA").

In response to the federal court's discovery order, the Commonwealth produced five police reports, each of which detailed distinct investigations into Robles' criminal conduct. The first of these reports, dated February 27, 1996, described an incident in which Robles approached two individuals, threatened them at gunpoint, and discharged his firearm into the air. When Detective Cabrera confronted Robles about the incident, Robles attempted to avoid arrest by offering to provide information about an unsolved murder. Robles ultimately identified to police the perpetrator of that homicide. Robles was never charged in connection with the assault.

The second police report, dated April 25, 1996, involved a gang-related shootout near Robles' residence. During their investigation, the police learned that, immediately after the shooting, a juvenile who had been staying with Robles hid guns and drugs in a safe that Robles owned and kept in a nearby apartment. The police also discovered that Robles' neighbors suspected that Robles was selling drugs out of his residence. Detective Cabrera recovered the then-empty safe from a neighbor. Instead of seizing the safe, Detective Cabrera returned it to Robles. When the police questioned the juvenile, Robles falsely claimed that he was the juvenile's guardian so that he could remain present during the interview. Robles ultimately advised the juvenile to confess in a manner that did not implicate Robles. Although Detective Cabrera discovered Robles' fingerprint on a cigar box containing 103 bags of crack cocaine that was recovered from the shooting suspect, and although Detective Cabrera threatened to arrest Robles, the police never charged Robles in connection with this incident.

The third withheld police report, dated August 1, 1997, involved the investigation of a call for shots fired. When police responded, they encountered Robles, who admitted to being armed with a firearm that he lawfully was licensed to carry. A man with Robles matched the description of the shooter, and the ammunition from Robles'

gun matched the spent shell casings found on the ground. Robles denied any involvement, the complainant remained anonymous, and Robles was not charged in connection with this incident.

The Commonwealth withheld a fourth police report, this one from September 18, 1997, that documented a police response to a report of shots fired on the block where Robles lived. The responding officer, who spoke with Robles, wrote in the report that he suspected Robles was involved in drug dealing. Robles was not charged in connection with this incident.

The fifth police report, dated November 7, 1997, described an investigation of yet another call for shots fired near Robles' residence. Three witnesses reported that shots were fired from Robles' residence. Upon arrival, the police recovered shell casings from a .40 caliber weapon. Robles told the police that he was not home when the shots were fired, and he denied owning a .40 caliber weapon. Despite Robles' denials, Detective Cabrera recovered a .40 caliber pistol that was registered to Robles. The police did not follow up with Robles or the witnesses. Once again, Robles was not charged.

In August 2010, Johnson amended his pending PCRA petition to allege that the Commonwealth violated *Brady* by withholding the above-described police reports. The PCRA court dismissed Johnson's amended petition as untimely. On appeal, however, this Court reversed and remanded for a merits review of Johnson's *Brady* claim. *See Commonwealth v. Johnson*, 64 A.3d 621 (Pa. 2013) (*per curiam*) (holding that "the information discovered during the federal *habeas* proceedings constitutes 'newly discovered' facts for purposes of the (b)(1)(ii) exception to the [PCRA's] jurisdictional time bar").

After remand, the PCRA court granted Johnson's petition for relief, and awarded him a new trial. The court characterized Robles as "an important Commonwealth

witness," PCRA Ct. Op. at 8, and explained that trial counsel could have used the withheld evidence to expose Robles' potential bias. According to the PCRA court, "[t]he volume of [ ] Robles' interactions with the Reading Police Department is clearly relevant to his bias and desire to assist the police and the Commonwealth to avoid interference with his own activities," especially in light of defense counsel's attempt at trial to introduce evidence of "Robles' interest." *Id.* at 6. The PCRA court also reasoned that, had the Commonwealth disclosed the police reports, defense counsel's cross-examination of Robles might have been very different, since the withheld impeachment evidence had "a direct bearing on [ ] Robles' desire to testify against [Johnson]". *Id.* at 8. Put simply, the PCRA court believed that, if the Commonwealth had disclosed the police reports prior to Johnson's trial, there was a reasonable probability that the jury's verdict would have been different. Consequently, the court found its confidence in the outcome of the trial to be undermined.

The Commonwealth now appeals the PCRA court's ruling.[4] We review the PCRA court's grant of relief to determine whether its decision is supported by the record and free of legal error. *Commonwealth v. Champney*, 65 A.3d 386, 396 (Pa. 2013). So

---

[4]    After the Commonwealth filed its Pa.R.A.P. 1925(b) statement, the PCRA court issued an order stating that it had already addressed each of the Commonwealth's issues in its July 6, 2015 opinion and order granting Johnson a new trial. The Commonwealth, however, contends that it raised eight additional issues that the PCRA court did not address in its July 6, 2015 opinion, and asks us to remand this case to the PCRA court with instructions to prepare a supplemental Rule 1925(a) opinion. We decline to do so, because the eight "issues" that the Commonwealth highlights are better understood as specific arguments regarding the PCRA court's *Brady* analysis. *See, e.g.,* Brief for Commonwealth at 29 (arguing that the PCRA court never responded to the Commonwealth's contention that the court's "ruling vastly expands the *Brady* requirement to encompass all police reports and other information available to the prosecution indicating that a prosecution witness has interacted with police and/or the witness' name has surfaced in a criminal investigation…"). The issue in this appeal is whether the PCRA court erred in granting Johnson a new trial. The July 6, 2015 opinion fully explains the court's rationale for having done so.

long as the PCRA court's factual findings are supported by the record, we will not disturb them. *Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011).

It is well-settled that the Commonwealth violates a defendant's right to due process when it withholds evidence that is both favorable to the defense and material to the defendant's guilt or punishment. *Brady*, 373 U.S. at 87. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The Commonwealth does not dispute that the withheld evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Nor does the Commonwealth deny that it "suppressed" the police reports, "either willfully or inadvertently." *Id.* at 282. Instead, the Commonwealth's primary contention is that the undisclosed police reports are not *Brady* material because they would not have been admissible as substantive evidence at Johnson's trial. *See* Brief for Commonwealth at 33-34.

The substantive admissibility of impeachment evidence, *vel non*, is not dispositive of a *Brady* claim. *See Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (clarifying that *Brady*'s materiality standard "is not reducible to a simple determination of admissibility"). The Commonwealth violates *Brady* by failing to disclose exculpatory evidence as well as evidence that may be used to impeach a prosecution witness. *Bagley*, 476 U.S. at 676. Documents like the police reports at issue here—which would not have been admissible as substantive evidence at Johnson's trial—may nevertheless contain information that can be used to impeach a witness. As the Second and Third Circuits have explained, "inadmissible evidence may be material if it could have been

used effectively to impeach or corral witnesses during cross-examination." *Johnson v. Folino*, 705 F.3d at 130 (citing *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)).

The Commonwealth's claim that materiality hinges upon admissibility is based upon a misreading of *Wood v. Bartholomew*, 516 U.S. 1 (1995). In that case, the government withheld the results of a witness' pre-trial polygraph test. Notably, however, the prosecution and the defense agreed that those results were inadmissible (both as substantive evidence and for impeachment purposes) as a matter of state law. Furthermore, trial counsel conceded that the polygraph results would not have affected his cross-examination of the prosecution's witness. In light of these two crucial concessions, the Supreme Court held that the polygraph results were not material for *Brady* purposes. *Wood*, 516 U.S. at 6-7.

Contrary to the Commonwealth's suggestion, *Wood* does not stand for the proposition that undisclosed impeachment evidence must be admissible (or lead to the discovery of admissible evidence) before it can be considered material. Rather, the *Wood* Court simply examined materiality by looking at the effect that the withheld evidence would have had on the outcome of the trial. The court determined that it would have had none. *Wood* sheds no light on the issue that we address here today.

Far from embracing an admissibility litmus test, the United States Supreme Court has explained that evidence is "material" for *Brady* purposes "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence"; it means only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

Applying these principles, the PCRA court concluded that the withheld police reports would have given defense counsel a basis to impeach Robles, and it discerned a reasonable probability that the cumulative effect of the reports would have changed the result of Johnson's trial. We have little difficulty agreeing with the PCRA court. The reports are textbook impeachment evidence.[5] They suggest that Robles sought to curry favor with the police in the face of ongoing criminal investigations and mounting evidence of his own criminal conduct. And they would have guided defense counsel's efforts to expose to the jury the "subtle factors" of self-interest upon which Johnson's life or liberty may have depended.[6]

Robles was the linchpin to the Commonwealth's case against Johnson. Competent counsel could have used the information in the police reports to cross-examine Robles and to weaken his credibility by exposing his bias and interest in cooperating with the Reading Police Department. A thorough cross-examination would have revealed that Robles hoped to receive favorable treatment from the authorities in

---

[5]    *See* Pa.R.E. 607(b) ("The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules."); *see also Commonwealth v. Collins*, 545 A.2d 882, 885 (Pa. 1988) ("Our law clearly establishes that any witness may be impeached by showing his bias or hostility, or by proving facts which would make such feelings probable."); *Danovitz v. Portnoy*, 161 A.2d 146 (Pa. 1960) (providing that a witness' bias towards a party against whom he or she is called to testify is pertinent to the question of the witness' credibility); *Grutski v. Kline*, 43 A.2d 142, 144 (Pa. 1945) ("Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross examination."); *Lenahan v. Pittston Coal Min. Co.*, 70 A. 884, 885 (Pa. 1908) ("It is always the right of a party against whom a witness is called to show by cross-examination that he has an interest direct or collateral in the result of the trial, or that he has a relation to the party from which bias would naturally arise. Such an examination goes to the credibility of the witness.").

[6]    *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

exchange for providing information. For example, the first police report revealed that Robles had responded to the investigation into his criminal activity by providing information regarding an unsolved murder; ultimately, Robles was not charged in connection with the incident under investigation. Evidence that Robles had provided information to the police out of his own self-interest might have cast doubt upon the veracity of Robles' testimony against Johnson. The police reports further evidenced Robles' motive to cooperate with the police in order to discern the status of investigations into his own crimes. *See* N.T. PCRA Hearing, 10/20-21/2014, at 105-106 (Detective Cabrera testifying that he believed that Robles' had a "vested interest," and was motivated to provide information to the police in order to ascertain the extent of police investigation into his own activities).

The withheld evidence also revealed instances where Robles had lied or deceived the police when it was in his interest to do so, by, for example, falsely claiming to be the juvenile's guardian when police were investigating the April 25, 1996 shots-fired incident, and by falsely denying ownership of a .40 caliber gun in connection with the November 7, 1997 investigation. In addition, the withheld evidence revealed that Robles had a motive to eliminate rival drug dealers such as Johnson's affiliates. Counsel attempted to explore this motivation at trial by suggesting that, as a known drug dealer, Robles had an ulterior motive in testifying for the prosecution. The trial court precluded this questioning after the prosecutor denied the existence of any evidence to support counsel's assertions. When confronted with the police reports at the PCRA hearing, Robles admitted that he was, in fact, a drug dealer.

The withheld police reports also would have permitted defense counsel to establish for the jury Robles' motive to lie to further his ongoing collaboration with the Reading Police Department. Evidence that Robles benefited from his relationship with

the police by being able to engage in drug sales without fear of repercussions would have suggested that Robles was motivated to provide testimony helpful to the prosecution in this case. *See, e.g., Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002) ("Evidence that [the witness] continually used drugs while acting as an informant and that the police knew about this but chose not to prosecute him would also be relevant to show his bias. If [the witness] was continually receiving a benefit from the prosecution—the ability to use drugs without fear of criminal repercussions—that would have given him a motive to provide the prosecution with inculpatory information, even if he had to fabricate it.").

Robles' criminal conduct, and his willingness to provide information implicating other individuals in criminal activity, likely would have elevated the importance of the letter that Robles sent to Detective Cabrera offering "to do anything" to get out of jail by demonstrating that Robles was motivated to provide information to the police to serve his own interests. On direct appeal, this Court found that, although this letter would have been "useful" in cross-examining Robles, it was, standing alone, insufficient to warrant a new trial. *Johnson*, 727 A.2d at 1096. It now turns out that the letter did not stand alone. Placed into the context of the other withheld evidence, the impeachment value of this letter becomes even stronger.

All of this notwithstanding, the Commonwealth now contends that the police reports are not material "in light of the evidence of [Johnson's] guilt" presented at trial, and because of the "truly insignificant nature of the information contained in the five reports." Brief for Commonwealth at 55 n.7. As we explained on direct appeal, however, Robles' testimony was the only evidence linking Johnson to the .38 caliber gun, and that gun was the only physical evidence linking Johnson to the Banks cousins'

murders.[7]   Without Robles' testimony, the Commonwealth was left with Johnson's account of the shootings, which fell short of proving the intent required for a first-degree murder conviction.  Robles, in other words, was the Commonwealth's keystone.  He tied Johnson to the murder weapon, and he undermined Johnson's defensive claim that he was not the gunman.

Without the police reports, Johnson's counsel was limited severely in his cross examination of Robles.  The most scandalous detail that counsel was able to elicit during his questioning was that Robles went by the nickname "Gambino."[8]  Because of the Commonwealth's nondisclosure, counsel was unable to explore—let alone establish—Robles' motive for testifying against his former friend.  We agree with the PCRA court that, had counsel been able to conduct this exploration, there is a reasonable probability that Johnson would not have been convicted of first-degree murder.

---

[7]     Additionally, Robles tied Johnson to the drug trade, asserted that Johnson and Bridges were drug partners, stated that the motive for the murders was revenge, and provided testimony to support an aggravating factor at the penalty phase.  *See* R.R. 1016-27a; *Johnson*, 727 A.2d at 1102 (observing that the Commonwealth presented Robles' testimony in the penalty phase "that [Johnson] was the 'enforcer' for co-defendant Bridges' drug operations, and that the murder was in connection with drug sales" to support the aggravating factor of 42 Pa.C.S. § 9711(d)(14) (that the murder was committed in connection with drug activity)).

[8]     In his closing argument, defense counsel reiterated this fact to the jury, clearly hoping that it would shade the jurors' assessment of Robles' credibility.  *See* R.R. at 863a ("Now, as I told you, the only connection that the Commonwealth can reasonably argue is the testimony of 'Gambino.'  Mr. Gambino—and he tries to say that [Johnson] wiped the gun and threw it away.  Well, Gambino's testimony is false.").

We affirm the PCRA court's order granting Johnson a new trial.[9]


Chief Justice Saylor and Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Mundy files a dissenting opinion.

---

[9] Johnson has requested leave to file a post-submission communication pursuant to Pa.R.A.P. 2501, wherein he updates the Court on the status of co-defendant Shawnfatee Bridges' federal *habeas corpus* appeal. Specifically, Johnson notes that the United States Court of Appeals for the Third Circuit recently affirmed a district court ruling awarding Bridges a new trial in connection with his claim that the Commonwealth failed to disclose exculpatory evidence. *See Bridges v. Sec'y of Pa. Dept. of Corr.*, 2017 WL 3834740 (3rd Cir. 2017). Although we grant Johnson's application, we do not rely upon the Third Circuit's reasoning, since the evidentiary record in Bridges' appeal is distinct from the one before us. *See id.* at *8 n.7 (discussing several affidavits that Bridges presented to the federal *habeas* court).